United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 4:18-cr-00158-JD-1 |
|---|---|
| Plaintiff, | |
| v. | **ORDER RE MOTION TO SUPPRESS** |
| DAHRYL LAMONT REYNOLDS, | Re: Dkt. No. 40 |
| Defendant. | |

This order resolves defendant Dahryl Lamont Reynolds's motion to suppress. Dkt. No. 40. The Court held an evidentiary hearing with witness testimony. Dkt. No. 97. The parties filed supplemental briefing after the hearing. Dkt. Nos. 99, 100. The motion is denied.

Reynolds challenges the seizure of evidence from his bedroom on the morning of November 25, 2017. He seeks to suppress methamphetamine, a scale, a 9-millimeter handgun, cash, and similar items found in his room. Dkt. No. 40 at 3, 6. He argues suppression is appropriate because the Berkeley Police searched the room without a warrant. The government denies that any officer entered or searched Reynolds's bedroom before a warrant was obtained.

## DISCUSSION

### I. LEGAL STANDARDS

While the burden of proof is ultimately on a defendant who seeks to suppress evidence, the burden of production is generally on the government. *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005). The government properly acknowledged this at the evidentiary hearing and in its initial briefing. *See* Dkt. No. 97 at 4:9-16; Dkt. No. 41 at 4. It changed gears in its post-hearing brief to suggest for the first time that the burden is on Reynolds because a warrant had been obtained. Dkt. No. 99 at 5. This new position simply begs the question of whether the search was pursuant to a valid warrant -- the main point of Reynolds's motion -- and who bears

the burden in this specific case. *See United States v. Miller*, Case No. 15-cr-00197-JD, 2016 WL 80565, at *2 (N.D. Cal. Jan. 7, 2016). This is not a case where the defendant agrees that evidence was obtained under a regularly issued warrant, which would require him to show the warrant was infirm. *See United States v. Barnes*, 895 F.3d 1200-01 (9th Cir. 2018). Rather, Reynolds claims that the police performed an unreasonable warrantless search, and it falls on the government to proffer persuasive evidence that there was no violation of the Fourth Amendment. *See Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 558 (9th Cir. 2018); *United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013). In this case, the government must produce evidence that the search was executed pursuant to a warrant.

## II.     THE NOVEMBER 25, 2017 EVENTS

Shortly after 3:00 a.m. on November 25, 2017, Berkeley Police Department ("BPD") officers responded to reports of gunfire in a South Berkeley neighborhood. Dkt. No. 40-2, Ex. A at ECF p.3. A few blocks east of where the shots were fired, an officer stopped and searched an individual, Bobby Anderson, and the red Dodge van he was in, finding suspected narcotics. *Id.* A short time later, Reynolds arrived on foot claiming ownership of the van. *Id.* Officers patted him down and found a gun magazine with multiple 9mm bullets and a large amount of currency in different denominations. *Id.* Reynolds does not challenge the search of his person. Next door to Reynolds's residence, police found spent 9mm casings. *Id.* They then conducted a "knock-and-talk" at his apartment, and were given permission to enter. Dkt. No. 40-2, Ex. D at ECF p.13. One of the other occupants of the apartment identified Reynolds's bedroom, which was closed with a locked door. *Id.*

BPD officers applied for a warrant to search Reynolds's room at 7:08 a.m. Dkt. No. 40-2, Ex. A at ECF pp.2-4. The warrant was issued at 8:03 a.m. Dkt. No. 40-2, Ex. B at ECF p.6.

## III.    THE SEARCH WAS DONE UNDER A WARRANT

Reynolds contends that Berkeley police officers entered his room prior to obtaining a warrant. This is based entirely on one item of evidence, namely a picture taken at 6:02 a.m. on November 25, 2017, showing that the door knob to his room had been detached. Dkt. No. 40-2, Ex. C at ECF pp.7-9.

2

1    Based on the testimony adduced at the evidentiary hearing, and other evidence in the
2    record, the Court finds there was no search of Reynolds's bedroom until after the warrant was
3    issued.  *See* Fed. R. Crim. P. 12(d).  At the hearing, BPD Detective Donovan Edwards testified
4    that police did not enter the room until "after I had applied for the search warrant and after the
5    search warrant was accepted."  Dkt. No. 97 at 26:18-19.  This testimony was credible and not
6    contradicted on cross-examination, or by other evidence.  *See United States v. Becerra-Garcia*,
7    397 F.3d 1167, 1172 (9th Cir. 2005).  Two other BPD officers who testified did not contradict
8    Detective Edwards.  Dkt. No. 97 at 55:8-57:4; 63:25-65:14.

Detective Edwards also testified to the events leading up to the search of Reynolds's bedroom on November 25, 2017.  He did an initial "knock-and-talk" at Reynolds's apartment at 3:59 a.m. because it was Anderson's probation address, Reynolds had walked over from that direction, and spent shell casings were found nearby.  *Id.* at 11:19-12:7.  The purpose of the visit to the apartment was to do a protective sweep to ensure there were no gunshot victims inside in light of the ammunition found on Reynolds and the prior gunfire reports.  *Id.* at 12:1-5.  Officers were able to sweep the apartment save for a locked bedroom, which a resident identified as Reynolds's room.  *Id.* at 12:19-14:11.  To ensure there were no gunshot victims inside the bedroom, Detective Edwards tried to open the door with a key that had been retrieved from Reynolds's person, but the door handle became detached from the doorframe.  *Id.* at 14:5-17.  After the door knob fell off, Detective Edwards testified that he did not enter the room and that the door remained locked and closed.  *Id.* at 15:19-16:13.  He then applied for a search warrant for the whole apartment, including the bedroom.  *Id.* at 15:25-16:22.  The search warrant affidavit did not discuss any items that Reynolds seeks to suppress or that were found in Reynolds's room.  *Id.* at 17:9-15; Dkt. No. 40-2, Ex. A at ECF pp.3-4.  Detective Edwards testified that the warrant was issued at 8:03 a.m., and it was executed at 8:05 a.m.  Dkt. No. 97 at 20:7-21:6; Dkt. No. 40-2, Ex. B at ECF p.6.  Because the door was locked and there was no door handle, officers had to break the door to enter the bedroom.  Dkt. No. 97 at 21:22-25.

This testimony is consistent with other evidence that shows police officers did not enter Reynolds's room until after the search warrant was issued.  A video, Ex. 7, that the parties agree

3

was taken around 7:15 a.m., Dkt. No. 97 at 17:23-18:9, shows the door knob detached, but the door otherwise undamaged and closed.[1] There were no signs that it had been forced open as Edwards testified had been necessary for entry. The first photographs of evidence recovered from Reynolds's bedroom were taken at 8:13 a.m., after the search warrant had been issued. Ex. 10; Dkt. No. 97 at 22:23-23:9, 24:21-23.

There are some minor details that were not exhaustively explored at the hearing, but they do not materially impugn the BPD witness testimony. For example, it is not clear why officers who arrived at Reynolds's apartment shortly before 4:00 a.m. waited until 6:00 a.m. to try the key recovered from Reynolds. Or why once the door knob fell off, there was no attempt to enter the room to check for gunshot victims. But that has no bearing on the facts critical to this motion -- whether the bedroom was searched before the warrant was issued.

Reynolds's suggestion of inconsistencies between Detective Edwards's testimony and the written police reports also do not undermine his credibility or indicate that the room was entered without a warrant. *See Jones Stevedoring Co. v. Director, Office of Workers' Comp. Program*, 133 F.3d 683, 692 (9th Cir. 1997). In the incident report, Detective Edwards described how he "attempted to open [the] door using the silver key I received from Ofc. Ludovico via Reynolds. The silver key kit [sic] into the key hole and turned side to side as it was apparent the key was a match to the door lock. However, the door knob was not functionally [sic] properly. I pulled on the door knob and it became detached from the door frame. We then had to force entry into the room to execute the service of the search warrant." Dkt. No. 40-2, Ex. D at ECF p.14. Reynolds says this, in conjunction with the fact that a photograph of the detached door knob was taken at 6:02 a.m., implies that BPD entered Reynolds's room prior to a search warrant being issued.

During testimony, Detective Edwards clarified that neither he nor any other officer entered the room immediately after the door knob was detached, and that no one entered the room at all until "after I had applied for the search warrant and after the search warrant was accepted." Dkt. No. 97 at 26:13-27:5. In a declaration submitted in support of the government's opposition to the

---

[1] Exhibit number refers to the evidence admitted at the evidentiary hearing on January 29, 2020, *see* Dkt. No. 97 (Hearing transcript); Dkt. No. 101 (Evidentiary hearing exhibit list).

4

motion to suppress, Detective Edwards stated, "We did not enter Mr. Reynold's [sic] room to search it until after the search warrant was signed. I do not recall the time when I entered the silver key into the door knob and the door knob became detached. I do remember, however, that the room was locked and that prior to entering Mr. Reynold's [sic] room to conduct the search, Officer Gasper had to force the door open and the door sustained damage as a result." Dkt. No. 43 ¶ 4. Officer Gasper, as well as other officers, also filed declarations that no one entered the room until the search warrant was signed. Dkt. Nos. 44, 45, 46.

## IV.   THE SEARCH WOULD HAVE BEEN REASONABLE WITHOUT A WARRANT

On this record, Reynolds has not shown that the search of his room was illegal. The officers did not enter it until they had a valid warrant. For the sake of completeness, the Court also finds that entering Reynolds's room without a warrant to sweep for possible gunshot victims would not have been unreasonable. The Supreme Court has specifically concluded that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The evidence demonstrates that Detective Edwards inserted the key to ensure there were no gunshot victims inside the room, not to obtain information. Dkt. No. 97 at 14:5-17; *see United States v. Jones*, 565 U.S. 400, 404-410 (2012). Another resident had already identified Reynolds's room. Dkt. No. 40-2, Ex. D at ECF p.13. Detective Edwards's belief that there might be a serious injury inside the bedroom was objectively reasonable given the reports of gunshots in the area, and the room had been identified as Reynolds's, who had been found with a gun magazine and described as arguing with a woman in front of the apartment just prior to the gunshots. *See Brigham City*, 547 U.S. at 400; Dkt. No. 40-2, Ex. A at ECF p.3.

The motion to suppress is denied.

**IT IS SO ORDERED.**

Dated: May 29, 2020

_____
JAMES DONATO
United States District Judge

5